[Cite as *Horak v. Horak*, 2018-Ohio-3659.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

JASON HORAK

     Appellant

v.

SARAH DECKER

     Appellee

C.A. No.     28731

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DR-2012-11-3425

DECISION AND JOURNAL ENTRY

Dated: September 12, 2018

CARR, Judge.

{¶1} Plaintiff-Appellant Jason Horak ("Husband") appeals from the decision of the Summit County Court of Common Pleas, Domestic Relations Division. We affirm in part, and reverse in part.

I.

{¶2} Husband married Defendant-Appellee Sarah Horak, nka Decker ("Wife"), on July 15, 2006. The parties have two children together. Husband filed a complaint for divorce in November 2012, and Wife answered and filed a counterclaim. A temporary order was issued in March 2013; no spousal or child support was ordered. However, Wife was ordered to make monthly payments on the leased Cadillac that she drove and to escrow the remaining $2,000 of the 2012 tax refund.

{¶3} Subsequently, Wife moved to set aside the order and the trial court granted the motion in part. In the entry, the trial court noted that Husband had failed to comply with all

discovery requests and thus Husband's net income from his automobile restoration business could not be determined. The trial court imputed $78,000 in income to Husband, based upon what he earned at his former job. Husband was ordered to pay $886.50 in child support when health insurance was provided and $875 in spousal support per month.

{¶4} At the time of the final hearing, the parties had come to an agreement concerning the custody of the children: Wife was designated the residential parent and legal custodian and Husband was to have parenting time with the children. Following the hearing, the magistrate issued a decision, which was incorporated into the divorce decree that the trial court issued the same day. That decision awarded Wife child support but not spousal support.

{¶5} Husband filed objections and supplemented the objections after the transcript of the final hearing was filed. The trial court overruled the objections. Husband attempted to appeal the divorce decree on two separate occasions; however, this Court determined the entries were not final, appealable orders. The trial court issued another judgment entry in July 2017. Husband has again appealed, raising eight assignments of error for our review.

II.

### ASSIGNMENT OF ERROR I

THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED WHEN IT MADE FINDINGS THAT APPELLANT WAS VOLUNTARILY UNDEREMPLOYED FOR THE PURPOSES OF ESTABLISHING CHILD AND SPOUSAL SUPPORT. THE COURT'S DETERMINATION OF UNDEREMPLOYMENT WAS NOT SUPPORTED BY THE SUFFICIENCY OR WEIGHT OF THE EVIDENCE PRESENTED AT THE TRIAL CONDUCTED IN THIS MATTER.

### ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION IN IMPUTING INCOME OF $75,000.00 PER YEAR TO PLAINTIFF FOR THE PURPOSES OF COMPUTATION OF CHILD SUPPORT AND SPOUSAL SUPPORT. THE AFORESAID FIGURE IS NOT SUPPORTED BY THE SUFFICIENCY OR

MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND THE COURT HAD NO BASIS TO ADOPT SUCH AN IMPUTED FIGURE.

{¶6}   Husband argues in his first assignment of error that the trial court erred in finding Husband was voluntarily underemployed.  Husband argues in his second assignment of error that the trial court abused its discretion in imputing him with an income of $75,000 for purposes of child support based upon that underemployment.

{¶7}   First, to the extent Husband challenges the trial court's imputation of income for purposes of spousal support, we note that the trial court in the final decree did not award Wife any spousal support.  Thus, to this extent, Husband's arguments are without merit.

{¶8}   "[W]e generally review a trial court's action on a magistrate's decision for an abuse of discretion, but do so with reference to the nature of the underlying matter."  (Internal quotations and citations omitted.)  *Harrison v. Lewis*, 9th Dist. Summit No. 28114, 2017-Ohio-275, ¶ 40. "In determining the appropriate level of child support, a trial court must calculate the gross income of the parents." *Stahl v. Stahl,* 9th Dist. Summit No. 27876, 2017-Ohio-4170, ¶ 19, quoting *Bajzer v. Bajzer*, 9th Dist. Summit No. 25635, 2012-Ohio-252, ¶ 11. R.C. 3119.01(C)(5) defines "[i]ncome" as used in Chapter 3119 as:  "(a) For a parent who is employed to full capacity, the gross income of the parent; (b) For a parent who is unemployed or underemployed, the sum of the gross income of the parent and any potential income of the parent."

> "Potential income" means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:
>
> (a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:
>
> (i) The parent's prior employment experience;
>
> (ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

(b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant.

R.C. 3119.01(C)(11). "[T]he trial court cannot impute income to either party without first making a finding that the party is voluntarily unemployed or underemployed." (Internal quotations and citations omitted.) *Collins v. Collins*, 9th Dist. Wayne No. 10CA0004, 2011-Ohio-2087, ¶ 27. "The burden of proof is on the parent who is claiming that the other is voluntarily unemployed or underemployed." *Stahl* at ¶ 19.

{¶9} "This Court reviews a trial court's factual finding that a parent is voluntarily unemployed to determine if it was against the manifest weight of the evidence." *Id.*, citing *Kent v. Kent*, 9th Dist. Summit No. 25231, 2010-Ohio-6428, ¶ 10-12. "The amount of potential income the court imputes once it finds voluntary unemployment, however, is a discretionary

determination that this Court will not disturb on appeal absent an abuse of discretion." *Stahl* at ¶ 19, citing *Rock v. Cabral*, 67 Ohio St.3d 108 (1993), syllabus.

{¶10} While Wife's income was undisputed at trial, Husband's income was highly contested. The parties filed joint tax returns in 2009, 2010, and 2011. The parties filed separate tax returns in 2012 and 2013. During all relevant periods, Wife worked for a law office. In 2013, the trial court found that Wife earned $37,067.95. From 2009 through part of 2011, Husband worked for Frankie & Dylan's, which is a business that does automotive repair work including collision and some custom restoration work. Husband did a variety of tasks for Frankie & Dylan's including office work and work in the shop. In addition, he would do research in the evenings and chat with people on the computer to bring in work. In 2010, taking into account the parties' total gross income and Wife's W-2 income, Husband earned a little over $75,000. In 2011, Husband earned approximately $41,000; however, according to Wife, Husband left Frankie & Dylan's midway through the year. At the time, Husband was making $1,500 a week, which would equate with $78,000 a year. Husband testified that he made $16.00 per hour, and thus, to make $1500 a week, he had to work about 94 to 96 hours. However, there was also testimony that the hours required were "billable hours[.]" Specifically, Husband testified that in order "to stay on that pay[, he would have] to get enough * * * billable hours, labor in the shop on metal work[.]" Husband boasted in his testimony about how he could complete most tasks faster than other people in the shop and so he had time to do additional tasks. Wife also did not believe Husband worked 94 hours a week. It is unclear from the record how many actual hours Husband had to work to accumulate the required billable hours, but there was testimony that Husband worked at the shop during the day and was on the computer at night.

{¶11} Husband left Frankie & Dylan's to start his own business, Horak's Restoration & Custom Auto Body. That business opened in March or April 2012. In support of a loan for that business, Husband submitted a document, which Wife typed, which discussed Husband's extensive experience restoring cars and also indicated that restoration work had been steady irrespective of the situation with the economy and that the economy had not impacted the restoration portion of the business. Those documents made it appear that Husband believed he could do better with his own business.

{¶12} Nonetheless, Husband testified that part of the reason he left Frankie & Dylan's to start his own business was that the market had crashed and there was not the same amount of work. In addition, Husband indicated that Wife wanted to leave the law office as she found it stressful. Thus, it was hoped that Wife could run the office of the new business and have more time with the children. Further, Husband hoped that the new business would get to a point where he could just run it and have surgery on his back. Husband suffered a back injury in 2004, and testified to having herniated discs, crushed vertebrae, and floating pieces of bone in his back. Husband receives chiropractic care and takes Motrin for the pain. At Frankie & Dylan's, other employees would help Husband with any heavy work or lifting, and at his own business, Husband had an employee to help him. Wife acknowledged that Husband had back pain, but there was no testimony that Husband's condition prevented him from working full time or that he had ever applied for disability benefits.

{¶13} Husband asserted that Wife supported his decision and helped file the paperwork to incorporate the business. Wife agreed that she helped type up the paperwork but testified that she told Husband not to quit Frankie & Dylan's because he made a lot of money working there.

Wife testified that Husband left Frankie & Dylan's because Husband did not get along with the owner's wife and they argued.

{¶14} Husband's 2012 tax return reflected that his gross receipts from his business amounted to $118,448, but after taking into account his costs and expenses, his net profit was under $6,000. In 2013, Husband had gross receipts or sales of $74,170 but ultimately reported a loss of $21,339.

{¶15} Ultimately, the magistrate found Husband voluntarily underemployed and imputed an income of $75,000 to him. The magistrate found Husband to be highly skilled in auto body work but lacking in business skills. The magistrate also found Husband to be in generally good health. The magistrate acknowledged that Husband had a back problem that continued to cause him pain, but also concluded that the problem did not prevent him from working full time. The trial court adopted the magistrate's decision and incorporated it into its own.

{¶16} Husband objected to the magistrate's finding of voluntary underemployment, the imputation of $75,000 as income, and the conclusion that he was in good health and did not suffer from a condition that hindered his ability to work full time. The trial court overruled Husband's objections.

{¶17} Husband's argument on appeal is limited. Husband asserts that he was not voluntarily underemployed because the decision to leave Frankie & Dylan's was based upon the economic conditions and was a mutual decision between Husband and Wife. Additionally, he notes that the decision to leave that job was not correlated with him filing for divorce as he left Frankie & Dylan's in 2011, long before the action was filed. Husband points to no case law that supports the conclusion that any of the above factors are determinative. *See* App.R. 16(A)(7).

**{¶18}** Even assuming the factors Husband references are relevant, Husband has not demonstrated that the trial court's decision was against the weight of the evidence. The trial court was presented with evidence that Wife did not want Husband to leave his prior employment, and it is clear that the trial court believed this testimony. Additionally, in light of the state of the record, the trial court was not required to believe that Husband's reasons for leaving his employment were primarily based on the economic conditions. Husband's loan proposal expressed that the restoration portion of the business was not negatively impacted by the economy. Further, the trial court could have found Husband's rationale suspicious; if the business at Frankie & Dylan's was suffering, the trial court could question why Husband would seek to start his own business in that climate. Finally, we note that "[f]or purposes of the child support statute, the term 'voluntary' means done by design or intention, intentional, proposed, intended, or not accidental. Intentionally and without coercion." (Internal quotations and citations omitted.) *Hahn v. Hahn*, 9th Dist. Medina No. 11CA0064-M, 2012-Ohio-2001, ¶32. In fact, "[t]he parent's subjective motivations for being voluntarily unemployed or underemployed play no part in the determination whether potential income is to be imputed to that parent in calculating his or her support obligation." (Emphasis omitted.) *Rock,* 67 Ohio St.3d at 111. We have concluded that "[a] parent's intentional and uncoerced resignation from employment which results in either no employment or substantially less income in subsequent employment would be one example of a situation in which a parent is voluntarily unemployed or voluntarily underemployed." *Collins*, 2011-Ohio-2087, at ¶ 27. Given Husband's limited argument and the record on appeal, Husband has not demonstrated that his situation does not fit squarely within the prior example. Accordingly, we cannot say that the trial court's finding that Husband was voluntarily underemployed was against the manifest weight of the evidence.

{¶19}  With respect to the amount of imputed income, Husband's argument on appeal is even more limited.  Husband acknowledges that the trial court considered the factors in R.C. 3119.1(C)(11).  However, Husband asserts that the trial court failed to appropriately consider Husband's back problem, the diminishing job prospects in the car restoration industry, and the fact that Husband's prior employment required him to work 94 hours per week to make $75,000 per year.

{¶20}  We cannot say that the trial court abused its discretion.  The trial court was aware of Husband's back problems and that he saw a chiropractor and took Motrin for pain.  However, the trial court was also aware that, at his prior place of employment, Husband had help with the heavy labor and that, despite his pain, Husband nonetheless worked full time, never filed for disability, and was able to make over $75,000 per year.

{¶21}  To the extent Husband argues that his business prospects were deteriorating at Frankie & Dylan's, we note that we have discussed this issue above.  The trial court could have reasonably disbelieved that Husband would start a new business in an industry if Husband actually believed that industry was dramatically declining.  To the extent Husband argues that he only made $75,000 by working 94 hours per week, we note there was evidence that Husband's salary was based on billable hours, which were correlated with time in the shop.  There was also testimony that Husband was faster and more efficient than the other employees.  Considering the totality of the evidence, the trial court could reasonably infer that Husband was not in fact actually working 94 hours.

{¶22}  In ruling on Husband's objections, the trial court considered the statutory factors that it believed were applicable in light of the evidence presented.  The trial court had before it evidence that Husband was highly skilled in automotive work, that Husband was capable of

working full time, and that Husband had made upwards of $75,000 per year at his prior job. *See* R.C. 3119.01(C)(11)(a)(i),(iii), (vi), and (vii). In light of Husband's limited argument on appeal, we cannot say that the trial court abused its discretion in imputing an income of $75,000 per year to Husband for purposes of calculating child support.

**{¶23}** Husband's first and second assignments of error are overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN REFUSING TO CREDIT APPELLANT FOR CERTAIN FUNDS RETAINED AND/OR SPENT BY APPELLEE IN CONTRADICTION AND VIOLATION OF VARIOUS INTERIM ORDERS OF THE COURT. SPECIFICALLY, APPELLEE'S TAKING AND CONVERTING THE 2013 TAX RETURN REFUND IN THE AMOUNT OF $4,298.00 AND THE 2012 TAX RETURN IN THE AMOUNT OF $4,000.00.

**{¶24}** Husband's argument in his third assignment of error focuses on the distribution of the parties' 2012 and 2013 tax refunds.

**{¶25}** "A domestic relations court enjoys broad discretion in making an equitable distribution of the parties' assets and liabilities." (Internal quotations and citations omitted.) *McGrew v. McGrew*, 9th Dist. Summit No. 28310, 2017-Ohio-7854, ¶ 14.

**{¶26}** In the temporary order, Wife was ordered to escrow the remainder of the 2012 tax refund, which amounted to $2000 of the approximately $4000 refund. At trial, Wife acknowledged that she had not done so. Wife averred that she could not escrow the money; she indicated that she needed the money for a down payment for her apartment and for items for the apartment. Wife also acknowledged that she had spent a portion of the 2013 tax refund on an appraisal needed for trial and her daughter's preschool. The remainder of the 2013 refund was in her account. At that time, Husband was in arrears on his child and spousal support payments by a significant amount and there was evidence that, because of that, Wife could not afford all of her expenses.

{¶27} In the magistrate's decision, and the trial court order adopting it, the court awarded Wife the remaining $2000 of the 2012 tax refund as part of the property division. In doing so, the court listed it in the property division spreadsheet and appears to have considered that amount in calculating the amount Husband owed Wife in order to achieve an equitable property division.

{¶28} The 2013 refund was not mentioned in the magistrate's decision or the trial court order adopting the magistrate's decision. In his objections to the magistrate's decision, Husband argued that Wife should have been held in contempt for failing to escrow the 2012 refund and that he should have received half of the 2013 refund as part of the property division. The trial court overruled his objections but also awarded Wife the full amount of 2013 refund. On appeal, Husband now argues that the trial court should have given him credit for half of both refunds by crediting his spousal and child support arrearages. Husband has not argued that he was entitled to receive any portion of the refunds.

{¶29} In Husband's objections, Husband never asked that half of the amount of the two refunds be credited against his spousal and child support arrearages. In fact, Husband did not challenge the disposition of the 2012 refund in his objections; he only asked that Wife be held in contempt for failing to escrow that money. "An objection to a magistrate's decision shall be specific and state with particularity all grounds for objection." Civ.R. 53(D)(3)(b)(ii). "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." Civ.R. 53(D)(3)(b)(iv). Accordingly, as Husband did not challenge the magistrate's disposition of the 2012 refund via objections, he has

forfeited that argument. *See* Civ.R. 53(D)(3)(b)(iv). Further, Husband has not argued plain error on appeal, and we decline to create an argument for him. *See Adams v. Adams*, 9th Dist. Wayne No. 13CA0022, 2014-Ohio-1327, ¶ 6; *see also Phillips v. Hostetler*, 9th Dist. Summit No. 28397, 2017-Ohio-2834, ¶ 17.

{¶30} With respect to the 2013 refund, the magistrate did not account for it in the magistrate's decision. Thus, the trial court, in ruling on the objections, was the first to address the 2013 refund, which it deemed marital property. In so doing, the trial court awarded the full amount of the 2013 tax refund to Wife but did not include it on the property division spreadsheet, nor does it appear that the trial court considered that amount in determining the amount Husband owed Wife in order to achieve an equitable property division. *See* R.C. 3105.171; *See Schiesswohl v. Schiesswohl*, 9th Dist. Summit No. 21629, 2004-Ohio-1615, ¶ 38 (discussing a marital tax refund as marital property). While Husband argues that the trial court was required to credit his child and spousal support arrearage with half of the 2013 refund, Husband has pointed to no law requiring the same. *See* App.R. 16(A)(7). Nonetheless, because the trial court failed to include the 2013 tax refund in the property division spreadsheet, and, thus, it appears it also failed to consider that amount when it calculated the amount Husband owed Wife to achieve an equitable distribution of the property, we agree the trial court erred.

{¶31} Husband's third assignment of error is sustained only to the extent detailed above.

## ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN ORDERING THE DEFICIENCY ON THE LEASED CADILLAC TO BE APPORTIONED ON AN EQUAL BASIS BETWEEN THE PARTIES AND/OR FOR THE FAILURE TO PROVIDE AN APPROPRIATE CREDIT TO APPELLANT FOR HIS SHARE OF THE DEFICIENCY. THE TRIAL COURT ERRED IN NOT MAKING DEFENDANT EXCLUSIVELY RESPONSIBLE FOR ANY DEFICIENCY.

{¶32} Husband argues in his fourth assignment of error that the trial court erred in failing to make Wife exclusively responsible for any deficiency on the leased Cadillac.

{¶33} The Cadillac was leased in Husband's name, but the vehicle was leased for Wife to drive. In the temporary order, Wife was ordered to pay the car payment on the Cadillac. Wife initially did so, but eventually became unable to make the payments. Wife maintained that she was unable to continue making payments due to Husband's failure to remain current in his child and spousal support payments. There is no dispute that Husband was significantly behind in his child and spousal support payments. Thereafter, Wife began to drive someone else's car as that person did not need the vehicle.

{¶34} As of November 10, 2013, $638.00 was past due on the car. Around that time, when Wife was behind two or three months in payments, she left the car at the end of Husband's parents' driveway. At that point, Wife asserted the mileage was around 31,000 miles and 34,000 or 36,000 miles were allowed under the entire lease term, which Wife believed went until March or April of 2014. Husband believed the mileage was higher when Wife dropped off the car. Husband testified to certain damage to the vehicle and the corresponding repairs that would be needed for the car. Wife acknowledged there was a scratch on the fender from a bicycle.

{¶35} After Wife dropped off the vehicle, Husband allowed a friend to use it. That friend made payments on the car and paid for some repairs. Sometime in 2014, Husband returned the car to the dealership. At that point, the payments on the car were not current, but Husband was unsure what would be owed on the car as Husband was waiting for the lender bank to pick up the car from the dealership.

{¶36} Prior to trial, Husband filed a motion seeking to hold Wife in contempt for failing to make the payments on the Cadillac as ordered. The magistrate in its decision did not

specifically address the motion for contempt; instead, it ordered Husband and Wife to each pay half of any deficiency on the Cadillac. The magistrate also ordered Husband to be solely responsible for the outstanding debt on the vehicle that he drove, which he was awarded under the property division. Husband objected to the magistrate's decision arguing that Wife should have been found in contempt for failing to make payments on the Cadillac, for damaging the car, and for exceeding the mileage. Additionally, Husband argued that Wife should be solely responsible for any deficiency.

**{¶37}** The trial court overruled Husband's objection, concluding that Wife's failure to make the payments was caused by Husband's failure to comply with his support obligations. Thus, the trial court found that a contempt finding was not warranted. Additionally, the trial court concluded that it was appropriate for Husband to pay half of any deficiency.

**{¶38}** After considering the record, and the trial court's and magistrate's entries, we conclude that the trial court did not act unreasonably in holding Husband responsible for half of any deficiency on the Cadillac. *See Polacheck v. Polacheck,* 9th Dist. Summit Nos. 26551, 26552, 2013-Ohio-5788, ¶ 7 ("As with the division of marital property, the equitable division of marital debt is a matter subject to the exercise of the trial court's discretion."). The trial court could have reasonably found Wife's testimony credible, and thereby determined that Husband's failure to fulfill his support obligations was the cause of Wife's failure to timely make payments on the Cadillac. Further, in light of the fact that the vehicle was returned to the dealership, the trial court could have also considered that neither party was receiving any value from the vehicle in evaluating how to apportion the debt. Accordingly, it was not an abuse of discretion for the trial court to hold Husband responsible for a portion of the deficiency.

**{¶39}** Husband's fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

THE TRIAL COURT ERRED IN FINDING THE ENTIRE VALUE OF THE "ORANGE CUDA" TO BE MARITAL WITHOUT ASCRIBING A PREMARITAL VALUE TO THE VEHICLE AS ESTABLISHED BY THE TESTIMONY PRESENTED.

**{¶40}** Husband argues in his fifth assignment of error that the trial court erred in finding the entire value of the orange "cuda" to be marital.

**{¶41}** We do not reach the merits of this assignment of error as Husband's objections to the magistrate's decision did not include an objection concerning the orange "cuda.[1]" *See* Civ.R. 53(D)(3)(b)(iv). Further, Husband has not argued plain error on appeal, and we decline to create an argument for him. *See Adams*, 2014-Ohio-1327, at ¶ 6; *see also Phillips,* 2017-Ohio-2834, at ¶ 17.

**{¶42}** Husband's fifth assignment of error is overruled.

**ASSIGNMENT OF ERROR VI**

THE TRIAL COURT ERRED IN FINDING THE ENHANCED VALUE OF THE "BLUE CUDA" TO BE ENTIRELY MARITAL IN CHARACTER.

**{¶43}** Husband argues in his sixth assignment of error that the trial court erred in finding the enhanced value of the blue "cuda" to be entirely marital in character. Specifically, Husband challenges the trial court's $1,200 premarital valuation of the blue cuda, arguing that it instead was worth $30,000 or $40,000.

**{¶44}** The value of two cars that Husband purchased prior to the marriage was the subject of much dispute during the trial. One was an orange 1971 Plymouth Barracuda (the orange "cuda"), mentioned above, and the second was a blue 1971 Plymouth Barracuda (the blue

---

[1] Husband's objection pertaining to the blue "cuda" mentions the orange "cuda" but there is no objection addressing the orange "cuda."

"cuda"). As Husband focuses on the premarital value of the vehicle, we will limit our discussion accordingly.

{¶45} Husband testified that he purchased the blue vehicle unrestored in 2000 and between 2000 and 2005, Husband stored the vehicle in his friend's garage. He purchased it along with a bunch of parts and assigned a value of $1,200 to the unrestored body of the vehicle but did not remember what he spent on the parts and vehicle together, although he guessed it could have been $15,000 to $20,000. The vehicle was not titled to him until 2005 and reflects a purchase price of $1,200. Husband emphasized that the $1,200 represented only the body of the vehicle, not any parts. Since 2005, Husband put a motor that was in a Charger that he acquired before the marriage into the blue vehicle. When asked how much work Husband had done on the blue car prior to the marriage in 2006, Husband was unable to provide a specific amount or number, apart from saying that "a lot of work was done." When Husband was again asked how much work had been done on the blue vehicle by the time he was married, Husband responded with: "A lot, but not – to be fair a lot, but not all." Husband's counsel then stated, "[n]ot all, okay. Did – was there—[.]" Husband then interrupted and added, "[t]he hard stuff." When asked to put a value on the blue car in 2005, Husband estimated the value at "[p]robably 30 grand[.]" After much back and forth and emphasizing that it was difficult to value the car, Husband estimated that the blue car was worth $45,000 at the time of the marriage.

{¶46} Husband's brother testified that when Husband bought the blue car it was a "bare shell of a car" and Husband restored the car himself. Husband's brother saw Husband working on the blue car prior to the marriage but could not say how much work was done when. Wife testified that when she first saw the blue car it was unrestored and described both cars as being in "horrible, horrible shape." Wife testified that the cars did not run at that time but Husband told

her they would be worth a lot of money when they were restored. Wife denied seeing Husband working on the two cars prior to the marriage, but says Husband was working on other cars at that time. Wife averred that restoration of the two vehicles did not happen until she and Husband were married and that the vehicles were shells prior to the marriage. She did not know at the time how much the blue vehicle was worth but Husband indicated he thought it was worth maybe $40,000.

{¶47} The magistrate concluded that the blue vehicle was worth $1,200 prior to the marriage and based this on what Husband paid for it. The magistrate noted that "Husband was unable to trace his investment in the blue Cuda before the date of the marriage, meaning he did not know how much work was done on it before the marriage." In addition, the magistrate pointed out that Husband "had no photographs to show significant work completed before the marriage."

{¶48} Husband objected to the magistrate's findings concerning the blue car and argued that there was no basis to treat any of the value of the blue vehicle as marital property. Husband argued that the blue car was worth more at the time of purchase than the value the expert appraised it for at the time of trial (which was $29,900). In overruling Husband's objection, the trial court found that Husband testified that he done a lot of work on the blue vehicle prior to the marriage but "not all the hard stuff[.]" In addition, the trial court reiterated the magistrate's findings that Husband had not traced his investment in the blue car prior to the marriage and thus only established a separate property interest of $1,200.

{¶49} On appeal, Husband argues that the trial court, in ruling on the objections, mischaracterized Husband's testimony pertaining to how much work had been done on the blue vehicle at the time of the marriage. The trial court viewed Husband's testimony as being that

"the hard stuff" had not been completed at the time of the marriage, whereas Husband believes his testimony was that "the hard stuff" had been completed at the time of the marriage. In reviewing the testimony, which we detailed above, we view it as somewhat ambiguous.

{¶50} Nonetheless, irrespective of any mischaracterization of that testimony by the trial court, we still conclude that the trial court did not abuse its discretion in overruling Husband's objection. Husband had a difficult time providing a value for the vehicle at the time of the marriage as well as detailing when the work on the vehicle was done. His testimony was somewhat rambling and vague and could be viewed with skepticism. At one point he testified that it was worth $30,000 in 2005, and at another point he testified that it was worth $45,000 at the time of the marriage; yet, his reasons for adopting that valuation are unclear. Husband also acknowledged that all the work was not done at the time of the marriage and could not quantify how much work was completed. There was testimony that Husband purchased the vehicle as a shell and that shell itself was valued at $1,200. The record is unclear as to how many of the parts he purchased at the same time as the vehicle went into the vehicle and what percentage of the parts used were obtained prior to the marriage. Husband testified that he used a motor from a Charger he purchased prior to the marriage but points to no place in the record where he placed a value on that motor, nor can we locate one. We are also aware that Wife denied that Husband restored the blue car prior to the marriage. It is apparent that the magistrate and trial court did not find Husband's valuation credible. Given all of the foregoing circumstances, we cannot say that the trial court abused its discretion in concluding the premarital value of the vehicle was $1,200.

{¶51} Husband's sixth assignment of error is overruled.

## ASSIGNMENT OF ERROR VII

THE TRIAL COURT ERRED WHEN IT ASCRIBED THE VALUE OF $17,189.42 FOR THE DODGE TRUCK TO APPELLANT'S ALLOCATION OF ASSETS IN PARAGRAPH NO. 17 OF THE ORDERS IN THE JUDGMENT ENTRY AS THE VALUE DOES NOT REFLECT THE ACTUAL EQUITY IN THE MOTOR VEHICLE AFTER DEDUCTION FOR SIGNIFICANT OUTSTANDING INDEBTEDNESS EXISTING AT THE TIME OF THE VALUATION OF THE ASSET.

**{¶52}** Husband argues in his seventh assignment of error that the trial court erred in valuing his truck.

**{¶53}** We do not reach the merits of this assignment of error as Husband's objections to the magistrate's decision did not include an objection concerning the valuation of his truck. *See* Civ.R. 53(D)(3)(b)(iv). Further, Husband has not argued plain error on appeal, and we decline to create an argument for him. *See Adams*, 2014-Ohio-1327, at ¶ 6; *see also Phillips,* 2017-Ohio-2834, at ¶ 17.

**{¶54}** Husband's seventh assignment of error is overruled.

## ASSIGNMENT OF ERROR VIII

THE TRIAL COURT'S JUDGMENT ENTRY IS NOT SUPPORTED BY THE SUFFICIENCY OR MANIFEST WEIGHT OF THE EVIDENCE AND IS AN ABUSE OF DISCRETION AS IT RELATES TO THE DETERMINATION THAT PLAINTIFF WAS VOLUNTARILY UNDEREMPLOYED. THE JUDGMENT OF THE TRIAL COURT IS NOT SUPPORTED BY THE EVIDENCE.

**{¶55}** In Husband's eighth assignment of error, Husband attempts to incorporate his prior assignments of error and broadly and in a conclusory fashion asserts the trial court erred. *See* App.R. 16(A)(7). As this Court has already addressed Husband's assignments of error above, we decline to further address this assignment of error.

**{¶56}** Husband's eighth assignment of error is overruled.

III.

**{¶57}** Husband's third assignment of error is sustained in part. Husband's remaining assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Domestic Relations Division is affirmed in part and reversed in part. This matter is remanded for proceedings consistent with this opinion.

Judgment affirmed in part,<br>
reversed in part,<br>
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

DONNA J. CARR
FOR THE COURT

TEODOSIO, J.
CONCURS.

SCHAFER, P. J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

DAVID M. LOWRY, Attorney at Law, for Appellant.

TERENCE E. SCANLON, Attorney at Law, for Appellee.